OPINION
{¶ 1} Appellant, James W. Price, appeals from a decision of the Mahoning County Court of Common Pleas, Juvenile Division granting custody of his minor daughter to appellee, Phyllis Carwell, the child's maternal great-grandmother.
 {¶ 2} This case concerns the custody of Durrie Chenona Davis, d.o.b. 9/13/1995. Durrie was born as a result of a relationship between Ieshia Davis and appellant. In early 1996, the Child Support Enforcement Agency filed a complaint on appellant's behalf seeking to determine paternity. The court determined appellant to be Durrie's father on June 19, 1996. At that time, the court put on a child support order for appellant and the parties agreed to abide by a transitional long distance visitation schedule. Appellant consented to Ieshia, as Durrie's residential parent, moving to Niagara Falls, New York. Appellee, Ieshia's grandmother, moved to New York with Ieshia and helped to care for Durrie and Durrie's half-brother, Ryan. Ieshia is Ryan's mother but he and Durrie have different fathers.
 {¶ 3} The testimony was not completely clear as to the following events but it seems that one day in 1999, Ieshia went to work and never returned home. Appellee then took Durrie and Ryan and moved to Detroit, Michigan where her mother, daughter, and grandsons resided. Appellee and the children moved in with these family members. It appears that Ieshia agreed to let the children reside with appellee and to let appellee be responsible for their health, education, and welfare. On August 20, 1999, appellant moved for an ex-parte order of custody. In his motion appellant alleged that Ieshia abandoned Durrie to the care of appellee and that he did not consent to such relocation of Durrie. Thus, appellant asked the court to grant him permanent custody of Durrie. The court denied the motion for an ex-parte order of custody. It then held a shelter care hearing on August 30, 1999. The court granted temporary custody of Durrie and Ryan to appellee pending a hearing on the petition for custody. The parties requested and the court appointed a guardian ad litem (GAL) for the children.
 {¶ 4} Due to many continuances for various reasons, the matter did not come for trial until March 28, 2002. During this time, a long-distance visitation order was in effect. The testimony conflicted as to how many times appellant visited Durrie. Appellee also moved with the children to Campbell, Ohio for approximately nine months and then moved back to Detroit. Additionally, Durrie made a false allegation of abuse against appellant. Consequently, appellant was not permitted to visit with Durrie while the allegation was being investigated. The matter finally made it to trial where the court listened to testimony from appellant, appellee, several family members and friends of appellant, the GAL, and conducted an in-chamber interview with Durrie and Ryan. The trial only concerned Durrie's custody since neither Ieshia nor Ryan's father petitioned the court for his custody.
 {¶ 5} The trial court entered its decision on May 14, 2002. The court concluded that the transfer of custody from appellee to appellant was not appropriate at this time. The court stated that it was "concerned with the award of custody when it would be detrimental to the child." It found by a preponderance of the evidence that to award custody to appellant would be detrimental to Durrie. The court opined that appellant had not demonstrated that he had taken efforts to become involved in Durrie's life and to establish a relationship with her. It further noted that to force a relationship on Durrie with appellant at this time would be detrimental to her health. Finally, the court noted that Durrie has bonded with appellee and her half-brother and other family members in Michigan where she is well cared for by appellee.
 {¶ 6} Appellant filed his timely notice of appeal on May 20, 2002.
 {¶ 7} Appellant raises one assignment of error, which states:
 {¶ 8} "The trial court erred as a matter of law, and abused its discretion, if there is any discretion in this matter, in designating the maternal great-grandmother, Phyllis Carwell, as the `custodial parent' (sic) of Durrie Chenona Davis, where, as here, the father of said child requested custody of his daughter, is a suitable parent, and the trial court did not make a specific finding as to what `detriment' the child would suffer as a result of having to live with and be raised by her father."
 {¶ 9} Appellant contends the trial court erred in awarding custody to appellee in the absence of a finding that he is unsuitable. He notes that the court cannot award a nonparent custody of a child without a finding that the parent is unsuitable because suitable parents have a fundamental right to raise their children. Citing, In re Lowe, 7th Dist. No. 00-CO-62, 2002-Ohio-440. Appellant contends that the benefits of being raised by her father will outweigh any short-term detriment to Durrie caused by a change in custody. He asserts that appellee failed to present any evidence that he is an unfit parent. He notes that the testimony demonstrated that he filed a paternity action to establish that he was Durrie's father, has attempted to have a relationship with Durrie since her birth, has paid child support, and has struggled to maintain contact with Durrie despite interference by appellee.
 {¶ 10} A trial court has broad discretion in custody matters.Booth v. Booth (1989), 44 Ohio St.3d 142, 144. Therefore, we will not reverse a trial court's custody determination unless it involves an abuse of discretion. Bechtol v. Bechtol (1990), 49 Ohio St.3d 21, 23. Abuse of discretion connotes more than an error in judgment; it implies that the trial court's attitude was arbitrary, unreasonable, or unconscionable.Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219.
 {¶ 11} The present case arose under R.C. 2151.23(A)(2), which gives the juvenile court exclusive original jurisdiction to determine the custody of any child not a ward of another court of the state. Ieshia had been Durrie's residential parent; however, she no longer wished to retain custody of Durrie. At the time of the hearing, appellee only had temporary custody of Durrie. Therefore, the trial court was faced with an original custody determination between a parent, appellant, and a nonparent, appellee. In an R.C. 2151.23(A)(2) child custody proceeding between a parent and a nonparent, the court may not award custody to the nonparent without first making a finding of parental unsuitability. Inre Perales (1977), 52 Ohio St.2d 89, syllabus. In other words the court must first determine by a preponderance of the evidence that: (1) the parent abandoned the child; (2) the parent contractually relinquished custody of the child; (3) the parent has become totally incapable of supporting or caring for the child; or (4) an award of custody to the parent would be detrimental to the child. Id. Parents who are deemed suitable have a "paramount" right to custody of their minor children. Id. at 97.
 {¶ 12} The Perales "suitability" test is distinguishable from the "best interest" test. Under the best interest test, the court looks for the best situation available to the child and places the child in that situation. Lowe, 7th Dist. No. 00-CO-62. The suitability test, on the other hand, requires a detriment to the child be shown before the court takes him/her away from an otherwise suitable parent. Id. Under the suitability test, "[s]imply because one situation or environment is the `better' situation does not mean the other is detrimental or harmful to the child." Id.
 {¶ 13} The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that no State shall "deprive any person of life, liberty, or property, without due process of law." The United States Supreme Court has repeatedly recognized this fundamental liberty interest to include the interest of parents to make decisions concerning the care, custody, and control of their children. See, e.g.,Meyer v. Nebraska (1923), 262 U.S. 390, 399, 401, 43 S.Ct. 625,67 L.Ed. 1042 (holding that the "liberty" protected by the Due Process Clause includes the right of parents to "establish a home and bring up children" and "to control the education of their own."); Pierce v. Society ofSisters (1925), 268 U.S. 510, 534-535, 45 S.Ct. 571, 69 L.Ed. 1070
(holding that the "liberty of parents and guardians" includes the right "to direct the upbringing and education of children under their control."); Prince v. Massachusetts (1944), 321 U.S. 158, 166,64 S.Ct. 438, 88 L.Ed. 645 ("It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder."); Stanley v. Illinois (1972), 405 U.S. 645, 651,92 S.Ct. 1208, 31 L.Ed.2d 551 ("It is plain that the interest of a parent in the companionship, care, custody, and management of his or her children `come[s] to this Court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements.'" (citation omitted)); Wisconsin v. Yoder (1972),406 U.S. 205, 232, 92 S.Ct. 1526, 32 L.Ed.2d 15 ("The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition."); Quilloin v. Walcott (1978),434 U.S. 246, 255, 98 S.Ct. 549, 54 L.Ed.2d 511 ("We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected."); Parham v. J.R. (1979), 442 U.S. 584, 602,99 S.Ct. 2493, 61 L.Ed.2d 101 ("Our jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children. Our cases have consistently followed that course."); Santosky v. Kramer (1982), 455 U.S. 745, 753,102 S.Ct. 1388, 71 L.Ed.2d 599 (discussing "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child."); Washington v. Glucksberg (1997), 521 U.S. 719, 720,117 S.Ct. 2258 ("In a long line of cases, we have held that, in addition to the specific freedoms protected by the Bill of Rights, the `liberty' specially protected by the Due Process Clause includes the righ[t] * * * to direct the education and upbringing of one's children." [citing Meyer andPierce]).
 {¶ 14} Most recently the Supreme Court emphasized the fundamental right of parents to make decisions concerning their children in Troxelv. Granville (2000), 530 U.S. 57, 120 S.Ct. 2054. In Troxel, the court held a Washington statute unconstitutional that permitted "any person" to petition a court at "any time" for visitation whenever visitation could "serve the best interest of the child." Wash. Rev. Code 26.10.160(3). The court noted that the Washington statute placed a best-interest determination in the hands of the trial court judge without any deference to the parent's judgment of what was in the child's best interest. The court took issue with the effect of the statute, which was that the trial court could disregard any fit custodial parent's decision regarding visitation with a third person based solely on the court's determination of what was in the child's best interest.
 {¶ 15} Importantly, the court highlighted the fact that no court had found that the parent in Troxel was unfit. The court stated, "[t]hat aspect of the case is important, for there is a presumption that fit parents act in the best interests of their children." Id. at 68. The court continued, stating, "so long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." Id. at 68-69. The court also opined, "the Due Process Clause does not permit a State to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a `better' decision could be made."Troxel, 570 U.S. at 72-73.
 {¶ 16} It is with these principles in mind that we examine the case before us.
 {¶ 17} In its judgment entry, the trial court found:
 {¶ 18} "The Father has not established to this Court that he has taken efforts to become involved in his child's life and has not established a relationship with her. To force a relationship on her at this time would be detrimental to her health. Minor Child has bonded with her Maternal Great Grandmother and brother and other family members in Michigan. Durrie is well cared for by her Maternal Great Grandmother and the home is suitable and appropriate. Durrie has also expressed fears relative to her Father and went as far as to make up a false accusation of abuse against him.
 {¶ 19} "Parents have no rights which transcend the child's best interest. A child's best interest for allocating rights and responsibilities is based on present circumstances, not on what possibly may happen in the future. Reynolds [v. Goll (1996), 75 Ohio St.3d 121],Seibert v. Seibert (1990), 66 O[hio] App.3d 342." (May 14, 2002 Judgment Entry).
 {¶ 20} Perhaps the most disturbing part of the trial court's decision is that the testimony the court noted in its findings of fact does not reconcile with its determination. The court noted that the GAL testified that appellant would be a fit parent. It also noted that appellee testified appellant is a fit father. Furthermore, as support for its decision, the court notes Durrie has bonded with appellee, Ryan, and other family members in Michigan; Durrie is well cared for by appellee; and appellee's home is suitable and appropriate. These findings are all consistent with the best interest test, which is not to be used as a way to find unsuitability. Given this conflict we must consider the evidence presented at trial.
 {¶ 21} The GAL recommended that the court grant appellee custody of Durrie. She opined that appellant has demonstrated a lack of interest in Durrie. (Tr. 101). She stated that an award of custody to appellant would be detrimental to Durrie, not because appellant is an unfit parent, but because Durrie has problems relating to him. (Tr. 104). The GAL testified that at the time when appellant and appellee had the same legal counsel and were not in a custody war with each other, Durrie was very comfortable with appellant and would run up to him when she saw him. (Tr. 139). She further testified that once the proceedings became contentious and the parties retained separate counsel, Durrie began to shy away from appellant. (Tr. 139). She also opined that appellant should have used the court system to see Durrie if he felt that appellee, or anyone else, was impeding his visitation. (Tr. 117). Importantly, when asked but for the alleged lack of a relationship with Durrie, was appellant a suitable parent, the GAL responded, "I'd say he's a fit custodian. He's a fit parent." (Tr. 109).
 {¶ 22} Additionally, other evidence presented at trial established that appellant is not unsuitable. When Durrie was born, it was appellant who sought to establish paternity. (Tr. 168, 218). Appellant has always paid child support. (Tr. 168). He has had contact with Durrie over the phone and has visited with her. (Tr. 221, 241, 268). Appellee even testified that appellant has always shown a kind, loving relationship with Durrie, although she added, "when he was there." (Tr. 169). Additionally, the GAL testified that appellant has steadfastly wanted to include Ryan in Durrie's life and that he wants to nurture and maintain the relationship between Durrie and her half-brother. (Tr. 108).
 {¶ 23} Moreover, appellant's lifestyle is stable and he has a plan for caring for Durrie. Appellant resides in a two-bedroom apartment in Austintown and has lived in the same apartment complex for seven years. (Tr. 211-12). He has been employed at Youngstown Developmental Center for 14 years. (Tr. 212). At work, he is responsible for supervising eight to ten clients at a time with various behavioral/developmental problems. (Tr. 212-13). The GAL testified that she observed appellant at work while he was unaware she was watching. She stated that appellant was patient and in control of his clients. (Tr. 102). Appellant works from 8:00 to 4:30 Monday through Friday. (Tr. 252). Appellant has a close family that resides in close proximity to him. (Tr. 214). Appellant testified that if Durrie lived with him, she would have her own room. (Tr. 243). He also testified that she would attend either Austintown schools or Summit Academy, which is a school run by his church. (Tr. 243). He also testified that his church has after school care where Durrie would go until he finished work. (Tr. 244-45). Finally, he testified that his brother, sister, sister-in-law, and friend have all volunteered to help him. (Tr. 245).
 {¶ 24} In support of appellant's alleged lack of interest in Durrie, the following testimony is relevant. Appellee testified that during 1999 appellant visited Durrie in Detroit five times and during 2000 he visited her three times. (Tr. 360-61). Appellee testified that she moved to Campbell, Ohio in January 2001 with the children and moved back to Detroit in early September 2001. (Tr. 362, 372). She stated that while they were living in Campbell, there were few visits between appellant and Durrie. (Tr. 372). Appellee testified that since they moved back to Detroit, appellant has not come to visit Durrie. (Tr. 373). She did testify that he has spent time with her at counseling sessions in Ohio and has called her seven or eight times. (Tr. 373-74).
 {¶ 25} As to the limited visitation, various reasons were put forth. Appellee testified that at least twice she told appellant that Durrie could not go with him for visitation because she was ill. (Tr. 173). Appellant testified that appellee made it difficult for him to visit with Durrie. (Tr. 229-31, 239). Appellant testified that for the first three years of Durrie's life while she was living in New York with Ieshia, he had frequent telephone contact with Ieshia and Durrie and tried to visit once a month. (Tr. 221-22). However, appellee testified that appellant did not visit Durrie for the first two years of her life. Appellant also testified that he tries to talk to Durrie one to three times a week and tries to visit her once a month. (Tr. 241).
 {¶ 26} Finally, we should note that we have considered Durrie's and Ryan's in-chamber interviews.
 {¶ 27} Although an award of custody to appellant may have a detrimental effect on Durrie at first, the record does not support the type of detriment contemplated by Perales, as to render appellant an unsuitable parent. Other cases that have found the contemplated detriment have found serious problems with the unsuitable parent. See, e.g., In reMedure, 7th Dist. No. 01 CO 03, 2002-Ohio-5035 (children distrusted the parent; parent verbally and physically abused the children, including hitting them with ropes; parent did not keep adequate supplies of food at home); In re Adams, 9th Dist. No. 01CA0026, 2001-Ohio-1652 (parent was incarcerated for three months after child was born; parent currently on probation in two counties; parent had disorderly conduct charges pending against him; parent had not paid child support for some time; parent had failed to use a car seat when transporting child; parent was unable to secure a stable home or lasting employment); Slivka v. Sealock (May 18, 2001), 5th Dist. No. 00-CA-13 (parent made statements that she wanted child back because she always wanted three children and, if child was not returned to her, she would just get pregnant again; parent had history of psychological and behavioral problems; parent's husband had domestic violence conviction); Reynolds v. Ross Cty. Children's Services Agency
(1983), 5 Ohio St.3d 27 (psychologist and psychiatrist testified they believed oldest child's allegations of sexual abuse by parent and that the children were afraid of being returned to the parent).
 {¶ 28} It is obvious that the type of detriment Durrie may endure as a result of moving from her home with appellee is not the sort of detriment that rises to the level of rendering appellant an unsuitable parent. The evidence at trial demonstrated that appellant has a secure job and home. It revealed that appellant is involved with his family and church. The evidence further showed that appellant has a plan for caring for Durrie. The GAL and appellee both opined that appellant is a fit parent. The only detriment to Durrie that appears on the record is that Durrie and appellant do not presently have a strong relationship; thus, Durrie may not adjust well to moving in with appellant. Such a problem can be remedied by a transitional visitation period leading up to full custody for appellant.
 {¶ 29} Based on the evidence, the trial court abused its discretion in awarding custody to appellee. The evidence does not support the finding that an award of custody would be detrimental to Durrie in such a way as to render appellant unsuitable. Although Durrie is well cared for and loved in her home with appellee, this does not make appellant an unsuitable parent. Additionally, even though Durrie will have an adjustment period to go through, this again does not mean it is to her detriment to be raised by her father. The longer she resides with appellee and establishes her life in Michigan, the more difficult an adjustment would be for her to move to Ohio with appellant in the future. Again, we must emphasize that both the GAL and appellee testified that appellant is a fit parent. Much of the testimony that seems to indicate appellee should have custody of Durrie goes to the best interest test. However, the trial court had to first find by a preponderance of the evidence that appellant is unsuitable before it awarded custody to appellee. The record does not support this conclusion.
 {¶ 30} Accordingly, appellant's assignment of error has merit.
 {¶ 31} For the reasons stated above, the decision of the trial court is hereby reversed and remanded. On remand, the trial court is instructed to order a transitional visitation schedule to be in effect through the remainder of the school year. After completion of the 2002-2003 school year, custody shall be awarded to appellant.
Vukovich and Waite, JJ., concur.